BAKER *v.* BELLOWS, EXECUTRIX.

4-6985                    170 S. W. 2d 75

Opinion delivered March 1, 1943.

*A. G. Bush, Chas. A. Walls, Lee Cazort, Jr., F. O. Butt* and *John K. Butt,* for appellants.

*C. A. Fuller* and *Virgil D. Willis,* for appellee.

CARTER, J. R. A. Bellows brought this suit during his lifetime, but died during the pendency thereof. The cause was revived in the name of Dortha Bellows, as the executrix of his estate. Bellows was brought to Arkansas by Norman Baker to help organize and run a hospital, induced by Baker's promise to give Bellows an interest in the business. Bellows alleged that in settlement of this obligation, Baker promised to pay him $25,000. A judgment was entered below in favor of the executrix in the sum of $24,500 against Norman Baker, individually, and against Norman Baker, Inc., an Arkansas corporation. At that time there was $8,935.25 in the registry of the court in this cause, and the decree ordered that this be paid over to the plaintiff to be credited on the judgment, leaving a balance of $15,564.75. Said balance was declared a first lien on certain property at Eureka Springs,

Arkansas, which had been conveyed to the defendant, Thelma Yount, by Norman Baker, Inc. It was decreed that if said balance be not paid said property be sold to pay the same. This lien was declared to be prior and paramount to any right, title, interest or equity of the defendant, Thelma Yount. Norman Baker, individually, Norman Baker, Inc., and Thelma Yount have appealed.

Two questions are presented: first, whether R. A. Bellows was entitled to recover judgment against Norman Baker and Norman Baker, Inc.; and second, whether he was entitled to collect this judgment out of the property which had been conveyed by Norman Baker, Inc., to Thelma Yount, legal title to which is vested in her.

Many of the facts are in dispute, but the statements made here are, we find, in accordance with the preponderance of the evidence. The record is very voluminous, the abstract of it consisting of 486 printed pages. It would serve no purpose to review in detail the conflicts of this evidence, and we shall simply state our conclusions therefrom.

Norman Baker, a former vaudeville actor, settled in Muscatine, Iowa, and engaged in several successful enterprises. Among other interests was a radio station at that place which he used to advertise his other enterprises, particularly a large retail store. R. A. Bellows, then a barber, was hired by Baker about 1926, and eventually became superintendent of all of the Baker enterprises. About 1929 or 1930, Baker began to promote a cancer cure. He opened a hospital or institute at Muscatine for treating cancer, which treatment and hospital he advertised extensively over the radio. Bellows was put in charge of the hospital, which was very profitable.

Criminal charges were filed against Baker for operating the hospital without a license to practice medicine, and he paid a heavy fine and served one day in jail. In 1931, Baker was enjoined from operating the hospital. Thereafter it was leased, or conditionally sold, to various of Baker's doctors who continued to operate it and to give the Baker cancer treatment. Bellows continued as superintendent. The radio advertising cam-

paign was continued under Baker's direction. Apparently all the profits were paid to him for such advertising. Baker eventually lost his broadcasting license, and, about 1931, he went to Nuevo Laredo, Mexico, and built a very powerful broadcasting station—one of the most powerful in the world. He organized a Mexican corporation to obtain the license and operate the station. The Baker cancer cure continued to be advertised over it. It was stated in argument that out of more than $700,000 which this station took in for its services, all but about $2,000 came from the Baker hospitals—from the cancer cure business.

Baker's trusted assistant, Thelma Yount, was placed in charge of the radio station and of the Mexican corporation which owned it. She organized an advertising agency in Laredo, Texas, which she later incorporated as the Globe Advertising Agency. The Baker hospitals had this agency handle all their advertising with the radio station and the agency got a commission. The largest part of the income of the hospitals was spent for advertising through this agency and over this radio station.

In 1937, Baker bought a hotel in Eureka Springs, Arkansas, taking title in the name of Norman Baker, Trustee, for the purpose of organizing a hospital there for cancer treatment. He caused a corporation to be formed, under the name of Norman Baker, Inc., to own and operate this hospital. Plaintiff Bellows was then in Muscatine, Iowa, helping run the cancer cure business there. That business was then being operated by one of Baker's doctors, Dr. Statler, either as Baker's lessee or as his conditional vendee. Baker brought both Statler and Bellows to Eureka Springs to run the new hospital. Baker was not nominally a stockholder, officer or director, but he was in absolute control of everything that was done. A tremendous advertising campaign was conducted under Baker's directions, both over the radio and through the mails. All the advertising went through the Globe Agency at Laredo, Texas, and most of it went to the Baker radio station. A large part of the advertising consisted of the broadcast of speeches by Baker.

In September, 1939, Baker, Bellows and Statler were indicted for using the mails to defraud in the promotion of this cancer cure, and were convicted. See *Baker* v. *United States,* 115 F. 2d 533 (8th Cir., 1940), where a description of their cancer cure may be found.

The chancellor filed written findings in this case. Among other things he found that Bellows came to Eureka Springs under a promise from Baker that plaintiff was to "receive a fixed salary and an interest in the business. As evidence of this fact, he was given two shares of stock in the original corporation, one share issued to himself, and one to his wife. At that time only a few shares had been issued." Without reviewing the evidence, we hold that this finding was supported by the preponderance of the evidence.

It was Baker's habit to keep as little cash in bank accounts as possible. No considerable balances were allowed to accumulate. When the balance got much over $5,000 the excess was drawn out in cash—mostly in bills of large denominations. These were secreted in the hospital, where there were several safes, some of them hidden safes. About once a month, or once every two months, Thelma Yount came from Laredo to Eureka Springs and collected large amounts in cash. This seems to have been retained by her in cash, not deposited anywhere. Sometime in 1939, according to the contention of appellants, there was an alarm over a possible revolution in Mexico and large amounts in cash were allegedly returned to Eureka Springs. In October, 1939, after the indictments were returned, Baker, explaining he feared a search warrant might be issued to search the hospital, had Bellows and his wife take to Thelma Yount in Laredo, Texas, the sum of $572,000 in currency. She returned to San Antonio with Bellows and paid $128,000 of this cash to Fenner & Beane to pay the balance due on some stocks, allegedly bought for the Mexican corporation.

The preponderance of the evidence shows that, no matter through what agencies, corporate or human, he operated, Baker was the one who controlled and did everything. He was not openly a stockholder of Norman

Baker, Inc., the Eureka Springs hospital corporation, but he controlled all its activities and no one else had any say about it. The officers and directors were his servants and agents who did whatever he said and did nothing except what he said. The same is true of the Mexican radio corporation. Miss Yount's advertising agency was, we believe, nothing more than an *alter ego* for Baker. The chancellor found, as to Baker: ''He conducted the whole show, through his employees and in the name, at times, of his different corporations. It was possible for him to show on the books of his American corporations a loss, and have the funds appear to be transferred to his Mexican corporation, and still keep the income in his pocket. This is evidenced by the fact that after his indictment at Little Rock, in September, 1939, he had in cash in Eureka Springs $572,000, and to avoid the possibility of having that much money found there, he secretly caused it to be taken to Old Mexico and delivered to Thelma Yount, one of his trusted employees and no doubt his financial confidant. It is strange that dividends were never paid by any of his corporations. They would operate so long as needed, and surrender their shares. His lawyer keeps all these records for his corporations. More than $100,000 of this money delivered to Thelma Yount in Mexico was turned over to Fenner & Beane, brokers, for investments in various stocks of corporations in this country in the name of his Mexican corporation. They admit now owning in this way at least $250,000 worth of such stocks. The rest of the money is somewhere in hiding and no doubt in a place where only Mr. Baker and some one of his trusted employees, possibly Miss Yount, can get to it. This money was evidently a part of the profit Norman Baker had made from the patients of Norman Baker, Inc. I say that because of the enormous amount of money received from the patients at Eureka Springs, as compared with the legitimate expenses in conducting the enterprise.''

The facts, as we get them from a study of the testimony, are that the sole actor in all these enterprises was Norman Baker. He used his servants, including Bellows, in any manner he saw fit. He made them stock-

holders or directors of his corporations, sometimes without their knowledge. He took their stock away when he saw fit. He used his corporations likewise. Norman Baker, Inc., operated the hospital and took in the money from the deluded sufferers who came there for treatment. Most of the money was spent on advertising. Baker's servants in the advertising agency contracted for the advertising and did what advertising work Baker himself did not do. The agency thus drew off the receipts of the hospital. Baker's *alter ego,* Thelma Yount, drew off a profit and the balance of the money then went to his Mexican radio corporation. Baker. sat in his suite of rooms in the hospital, surrounded by his hidden safes, and operated everything over a teletype connection with Thelma Yount at Laredo, this means of communication being selected because of its guaranteed privacy. The profits which end up in the hands of the Mexican corporation disappear, in cash or in stocks, into lock boxes or other hiding places. While Baker was in jail pending his appeal he wrote to Thelma Yount: "May be best to get any of the stock and bonds in Canadian lock.boxes. I would not want the money anywhere but in safety deposit boxes, if I go on up. Event of your death while I am in prison what in hell would happen? . . . Lots of love and kisses."

After the conviction of Baker and Bellows and Dr. Statler, they were held in the Pulaski county jail while application was made for bond pending their appeal. Baker informed Bellows and Statler he wanted them to reopen the hospital when they got out. Both refused to have anything more to do with it. They both held stock in Norman Baker, Inc., the certificates of Bellows, at least, having been indorsed in blank when issued and placed in Baker's possession. After Bellows and Statler refused to continue with the hospital, Baker told them that he had directed that their shares be transferred to his name. Bellows shortly thereafter demanded a settlement of his interest in the business. He had been promised an interest when he was brought to Eureka Springs. There were six persons present in the jail when the settlement was agreed upon. The testimony as

to what was said and done is in irreconcilable conflict. This conflicting testimony takes up a large part of the voluminous record. The preponderance of the evidence supports the chancellor's finding that Norman Baker agreed to pay Bellows $25,000 and that Thelma Yount was then directed by Baker to take care of it and not bother him any more about it. Some time later the Bellows stock was transferred and Bellows was notified by letter that he was no longer connected with the hospital corporation.

Thereafter Thelma Yount gave Bellows $500, which he said was to apply on the settlement. When bond was fixed at $5,000 for Bellows and $3,000 for Statler, Baker sent Yount to get the money from one of his safes. She told Bellows not to worry about his bond, that he had money coming to him and she would put it up. She got the money and put it up with the surety company as collateral for the bond, and took a receipt from the company showing Bellows had put up the money and was the owner thereof. Bellows was not present. He was then in jail. Later she had the form of receipt changed to show that Norman Baker, Inc., owned the money.

The trial court found that these part payments and the transfer of the stock took the transaction out of the statute of frauds. There is no argument here that this finding is not correct, although there is strong contention that the facts on which the legal conclusion is based are not true. The statute of frauds was not pleaded.

It is claimed that in May, 1939, Thelma Yount loaned $5,000 to Norman Baker, Inc.; that in June she loaned it another $5,000, and that in September, 1939, she loaned it $20,000. This last loan was just about the time of the indictment and shortly before Norman Baker sent $572,-000 in currency from Eureka Springs to Thelma Yount at Laredo, Texas. In September, the three loans were put in one note and a mortgage to secure it was given on the Eureka Springs properties held in the name of Norman Baker, Inc. Some defect was found in this mortgage and another was executed to replace it in December, 1939. This was signed by Bellows as secretary of

Norman Baker, Inc. In October, 1940, all of this property was deeded to Thelma Yount in satisfaction of this alleged debt. This property was attached in this suit, the attachment was sustained, and this is the property which was ordered to be sold to satisfy the judgment against Baker and Norman Baker, Inc.

In connection with the making of the appeal bonds, Norman Baker caused about $9,000 to be placed in the hands of the National Surety Company to secure it in making the bonds. Garnishment was issued and the surety company paid $8,935.25 into court. It is claimed this money was loaned by Norman Baker to Norman Baker, Inc., and was its property. This is the money which the clerk was ordered to pay to plaintiff on her judgment.

In our opinion the evidence warranted the findings by the chancellor that plaintiff was entitled to judgment for $25,000, less the $500 paid by Yount, against Norman Baker, that Baker had requested plaintiff to render services and had promised to see that plaintiff received an interest in the business as part compensation therefor; that plaintiff rendered the services and that in settlement of plaintiff's claim for compensation, Baker agreed to pay him $25,000; and told Thelma Yount to get it for him.

The chancellor also was correct in holding that plaintiff was entitled to enforce this judgment against the properties of Baker which can be reached in Arkansas, being the properties the legal title to which was formerly held by Norman Baker, Inc., but which had been first mortgaged to and later conveyed to Thelma Yount. The fact that Norman Baker, Inc., was legally incorporated and enjoyed under the law a separate legal personality, and the fact that Thelma Yount is a natural legal person, both of whom could own property separate and apart from Norman Baker, are immaterial. As stated, the preponderance of the evidence shows that everything that was done in this whole enterprise was done by Baker and everything that was owned was owned by him. The fact that he used servants and employees as the nominal stockholders of his corporations or as the nominal owners of his properties cannot pre-

vent the court from seeing the true facts and from determining the rights of the parties on the basis thereof.

We see no need for discussing the question when the courts may or may not disregard the corporate fiction and pierce the veil of corporate entity, nor as to when persons may be treated as trustees *ex maleficio*. Norman Baker's corporations and employees, under the facts here, did nothing except to hold the naked legal titles for him and in our opinion such devices should be wholly disregarded.

Norman Baker, Inc., took in the money. Baker himself, having been in trouble once for running a hospital without a license to practice medicine, was not a stockholder nor an officer. He ran the business, however, through his faithful servants, Statler and Bellows, whose stock certificates, indorsed in blank, were in Baker's hands from the date of issuance and which he took from them when they refused to continue to do his bidding after they had been convicted and sentenced to the penitentiary for carrying out his orders. Baker drained off all the profits to an advertising agency run by others of his faithful servants, and none of his servants was more faithful than Miss Yount who was in charge of this agency. Baker in turn drained off most of the money from the agency to his Mexican corporation, and we find Miss Yount the custodian, and the only person knowing the whereabouts of, the cash and securities which represent the final results of these various activities and manipulations, holding them for Baker. When Norman Baker, Inc., paid the advertising agency, it was Baker paying Baker; when the agency paid the radio station, it was Baker paying Baker; when Yount loaned to Norman Baker, Inc., it was Baker lending to Baker and taking a mortgage from Baker to Baker to secure the loan; and when Norman Baker, Inc., conveyed to Yount, it was Baker conveying to Baker. Plaintiff has a judgment against Norman Baker and is entitled to recover it out of any of Baker's property, no matter under which of his various aliases he holds title thereto.

The question in this case which has given us more concern than any other is whether plaintiff has come into

court with clean hands. The case, however, must be tried on the record made in the lower court.

In the lower court, all of the parties insisted that they all acted in good faith throughout these enterprises. The appellants, who are going to be hurt by our acceptance of their statement as true, have specifically stated in their briefs that Bellows had the utmost faith in the effectiveness of the Baker treatments administered at the Baker hospitals. His act in carrying over half a million dollars for Baker from Eureka Springs to Laredo, after the indictment, was the act of an honest and faithful servant and does not comport with the actions of a crook. Many ignorant people believed in this cancer cure. It is possible that Bellows did, at least appellants ask that we determine their rights upon the assumption that Bellows so believed. Bellows was an ignorant country barber when Baker first hired him. It is possible that he was ignorant of the fraud that was being practiced upon the patients at the hospital. For this reason the court is of the opinion that it would not be justified in finding from the record that his hands are not clean or in setting aside, on such basis, the decree in his favor.

Affirmed.

GRIFFIN SMITH, C. J., dissenting. Briefs and the abstract contain 741 pages of printed matter. The record is far more voluminous. The controversy was submitted on oral argument February 22. An opinion is now handed down that reviews evidence most favorable to the plaintiff below. This is because it is thought that somewhere in that twilight zone where fact challenges fact, appellee's testimony has, in *weight,* overcome that offered by appellants. Hence, it is said, a *preponderance* lies on the designated side of an imaginary line judges endeavor to identify and more clearly define. Result is that the reward of litigation goes to him whose diligence has overcome the so-called ''balance.'' Transition from the nebulous to the *juridical absolute* then occurs.

A statesman whose brilliant mind and forceful character attracted national attention was murdered because he wrote an editorial entitled, ''Across the Muddy

Chasm.'' The theme is suggestive of the controversy between men like Norman Baker and R. A. Bellows—men who by virtue of stratagem and conscienceless deception foisted upon hopeful sufferers an alleged ''cure'' for cancer which was later defined by the government as the handiwork of charlatans. Exposure did not come until thousands had been vicitimized as they walked through the valley of the shadow of death. Those comprising this army of the diseased hoped against hope that the self-styled miracle worker from Iowa—the unethical advertiser who was driven into Mexico, but who used Eureko Springs as a base for profits—might do for them what modern medicine, surgery and science had failed to completely accomplish.

Baker was sent to prison. Bellows was found guilty of using the mails to defraud, but died after testimony in this suit had been taken.

Baker and Bellows had been associated in various ventures for more than fifteen years. After 1918 Bellows was employed as credit manager for stores operated in New York, Akron, Indianapolis, Grand Rapids, and elsewhere—eight separate assignments as the head of important enterprises. Finally he went to Muscatine as manager of a clothing company. In 1926 he became associated with Baker, who operated a large retail store at Muscatine. At the expiration of nine months Bellows was retained as manager for Baker's extensive enterprises, including an oil station, radio broadcasting plant, a retail store at Davenport, a factory, printing shop, and other activities.

In appellants' reply brief it is stated that Baker—admittedly a shrewd business man—sent Bellows to Kansas City ''to be cured of a cancer'' and to investigate a treatment administered by Dr. Ozias. There must have been a favorable report on financial possibilities of the Ozias process, for immediately after Bellows returned, Baker opened his ''hospital'' at Muscatine. This occurred in December, 1929. Bellows was superintendent. At federal court trial in Little Rock Bellows swore he had never been a stockholder in the company just men-

tioned. It developed, however, that in 1932 he filed suit at Muscatine to replevy fifty-four shares of stock in Norman Baker Investment Company, and swore that he had paid for the shares and they were delivered to him.

While superintendent of the Baker hospital at Muscatine, Bellows was defendant in a suit brought to enjoin him and others from practicing medicine without license. The Supreme Court extended the interdiction to Baker, who had not been restrained by the district court. Baker then leased the property to Dr. Potter. Bellows, in respect of his services, "commuted" between Potter and Baker, working for each. Dr. Statler operated the Baker hospital at Muscatine under a conditional lease, but the contract was cancelled in 1932.

The charge against Baker, Bellows, and a Miss Amiss, was that they were fraudulently practicing medicine. It constituted a felony under Iowa laws. In the trial from which the instant appeal comes Bellows was asked: "And Mr. Baker entered a plea of guilty and 'took the rap' to let you and Miss Amiss and the others out, didn't he?" Answer: "That's right."

Bellows also testified he ". . . thought the charges were juggled around so Baker could pay a thousand-dollar fine and spend a day in jail."

In the face of this record and other facts to be mentioned later, I involuntarily recoil from the majority's declaration that *"Bellows' act in carrying over a half million dollars for Baker from Eureka Springs to Laredo, after the indictment, was the act of an honest and faithful servant and does not comport with the actions of a crook."*

This surprising statement by the court, I am frank to say, has left me in bewilderment. The status becomes accentuated when it is remembered that the mortgage Thelma Yount procured on the Eureka Springs realty was executed by Bellows. In May, 1939, $5,000 was ostensibly borrowed of Thelma. In June $5,000 more of Thelma's money was loaned, with an additional $20,000 in September. These transactions, *prima facie,* were consummated by Bellows, who signed the notes and com-

puted interest. When the larger sum was advanced, the two $5,000 items were combined with the $20,000 and a note executed for $30,000. This is the note secured by a mortgage which Bellows, as secretary, signed.

The majority opinion recognizes and gives effect to the naïve explanation by Bellows that he, in the capacity of "honest and faithful servant," carried $572,000 in a money belt from Eureka Springs to Laredo and was utterly oblivious to any suspicion that the leather around his waist was the container of currency destined for a lockbox. It was merely a circumstance, let us presume, that while in jail at Little Rock this servant whose fidelity remained unimpaired suddenly realized that the time had come for an accounting; that he should collect for worthless stock from which value had been syphoned by Bellows himself when as a co-conspirator he denuded the Eureka Springs treasury of assets.

There are many transactions shedding light on the close association between Baker, Bellows, Statler, and Thelma. All were equally enmeshed in transparent schemes to wrest money from cancer sufferers.

"But that I am forbid to tell the secret of my prisonhouse, I could a tale unfold whose lightest word would harrow up thy soul. . . ." This dramatic nocturnal declaration to the Prince of Denmark, coming from a ghost in front of Elsinore castle, is no stranger than Bellows' version of his contract with Baker, made in the prisonhouse at Little Rock.

Nothing is said in the majority opinion concerning Baker's contention (sustained by other testimony) that Bellows' demand for $25,000 was the price of silence. According to this evidence Bellows threatened to reveal to federal treasury authorities certain information that would affect income tax returns. This may, or may not, be true. But why should the soiled linen tendered by one group of manipulators be accepted at the cleaners in preference to that of others similiarly situated? Prison walls and locked steel doors are not conducive to comradeship, and it is not strange that, while awaiting trial or transportation after conviction, former amenities should be interrupted.

That Bellows was as deep in the mud as Baker was in the mire appears too clear for argument. And yet an opinion finds its way into official Reports which places upon Bellows the stamp of judicial approval: one whose conduct finds approbation—"an honest, faithful servant." The entire decision rests upon the proposition that "It is possible [Bellows] was ignorant of the fraud that was being practiced upon the patients at the hospital." Here is recognition by the majority that fraud *was* being practiced; and yet Bellows, superintendent and generalissimo at large, money-carrier, mortgage-maker, and the executor of company notes, saw nothing, heard nothing, sensed nothing.

It is obvious, at least by analogy, that if the majority believed Bellows did not come into court with clean hands he would have no standing; and such, of course, is true.

But what conduct, may I respectfully ask, would be required in the circumstances of this case to tarnish the palms and begrime the fingers of Norman Baker's associate?

Results in affirming the appeal show that fifteen years as the agent, associate, manager, superintendent, financial expert, and close personal friend are not sufficient.

We know that being secretary of a corporation he helped denude did not arouse his suspicions that all was not well with the Baker line.

It is equally certain that Bellows' little journey to Laredo, bearing the financial balm of Gilead, his jailhouse conversations, and his relationship to all that was going on—we know judicially that the hand of Esau was not confused with the voice of Jacob.

Again, may I pleadingly ask, what act upon the part of Baker would have awakened Bellows from his drowsiness?

"He who comes into equity must come with clean hands." Pomeroy, v. 2, 5th Ed., p. 90. Another expression is: "He that hath committed iniquity shall not have equity"; and again: "No right of action shall arise out

of an immoral cause." Apropos of the situation with which we are dealing is the rule that if both parties to litigation are equally at fault, the defendant's position is the stronger.

The situation here is that one wrongdoer is recouping from another's gains, implemented by the courts.

In answer to a newspaper reporter's question, the late Oliver Wendell Holmes, while a justice of the Supreme Court of the United States, said: "When I write a majority opinion I *think* I am right; when I write a dissenting opinion I *know* I am right."

So, here, there is the abiding conviction—although I am a lone dissenter—that the majority opinion departs radically from the clean hands doctrine, and that it makes available to participants in Baker's criminal transactions facilities of a court of equity which should remain inviolate.

I would dismiss the complaint for want of equity.